## RUE HIGH, APPELLANT.

*Held,* that the court of probate had power, under R. S. 1838, p. 435, §§ 28, 30 p. 385, §§ 6, 7, to issue a commission to take the deposition of a witness to a will, residing out of the state.

It is not necessary that any particular form of words should be used to make a will.

A will of personal property, regularly made according to the forms and solemnities required by the law of the testator's domicil, is sufficient to pass such property in every other country in which the same is situate.

Domicil, how defined, and how, and from what facts and circumstances it may be inferred.

Sec. 4 of R. S 1838, p. 270 is merely declaratory of the right which every person has, at the common law, to dispose of his personal property by will.

Sec. 5 of R. S. 1838, p. 270, which requires that wills, whether of real or personal property, "shall be attested and subscribed, in the presence of the testator, by three or more competent witnesses," as amended by S. L. 1839, p. 220, § 14, applies only to wills executed within the state.

The common law prevails in this state, as to wills executed abroad, by persons domiciled here.

By the common law it is not essential to the validity of a will that it should be attested by witnesses.

*Held,* accordingly, that a will of personal property executed abroad, by a person who died there, but whose domicil was, at the time, in this state, was valid, though unattested by three witnesses.

In the absence of proof to the contrary, it will be presumed that the common law as in force in this state, prevails in a foreign country.

A legatee is a competent witness to a will, where the statute renders the legacy to a witness void. *Semble.*

APPEAL of Rue High from the decree of the Probate Court of Macomb county, admitting to probate a certain instrument hereinafter set forth, as the last will and testament of Nathaniel High, deceased. The instrument was presented for probate by Joseph C. High, the principal

legatee therein named.   The appellant was the father of
the deceased.

The following facts appeared on the hearing in this ·
court :

Nathaniel High, the testator, was born in the state of
Vermont about the year 1812 and continued to reside there
with his parents, who were domiciled in that state, until
about eighteen years of age, when he left the parental
roof and went South.   He remained at the South until
the year 1842.   During his absence, his parents, two of
his brothers, and two sisters emigrated from Vermont to
this state,—the parents and one of the brothers, Joseph
C., and Mrs. Merrill, one of the sisters, taking up their
residence near Mt. Clemens in Macomb county, where
they have resided ever since.   The parents came here as
early as 1832.   At what time the brothers and sisters
came, did not distinctly appear, but they were domiciled
here in 1842, and had been for some time previous.   One
of the younger members of the family only, remained in
Vermont.   Early in 1842 the testator came to Macomb
county for the purpose, as he said, of visiting his relatives
from whom he had been so long absent.   He was unmar-
ried, and in feeble health.   He said that during most of
his absence South, he had been residing on the Island of
Cuba.   Capt. Canfield, one of the witnesses, testified to
different conversations had with the testator during his
stay in Macomb county, in which he expressed doubts as
to whether he should live long ; said that he intended to
go a sea voyage for his health ; that he had been advised
to do so by his physicians ; that if he lived to return he
intended to make Macomb county his home ; that his
friends lived there.   On one occasion he said that he had
been negotiating for the purchase of a farm near Mt. Clem-
ens, known as the Conger farm, but that he was then
unable to procure a title from the person who had it in

charge; that he must soon leave on account of his health, and that if he was unable to complete the purchase before his departure, he should leave money with his brother Joseph C., to purchase it for him. He said he wished to buy some land, that he might have a place to call his home; that he had been roaming about the world, and could not tell, when asked, where he lived; he hardly knew where he belonged; he wanted a place to call his own. At another time he expressed to the witness a wish to loan some money, if he could do so ·on good security. Witness thereupon expressed a desire to borrow money of him, and offered to give him security on real estate. Some time afterwards the testator came to witness' house, and there loaned some money to witness, who executed to him a mortgage on real estate, to secure the same. During the transaction of this business the testator again spoke of leaving soon, and being asked by whom his business would be settled in case he never lived to return, he replied by his brother Joseph C. When the mortgage came to be drawn, he was asked in what place he should be described as residing: he replied in Macomb county, Michigan; that he knew of no other place where he lived; and the mortgage was drawn in pursuance of such direction.

H. D. Terry testified that in June 1842 the testator proposed to him to purchase the Conger farm, of which he had the agency; that he told the testator that he did not wish to sell the farm to a speculator, and that the testator replied that he wished to purchase it to settle upon. The witness further testified that no bargain was then concluded, but that some months afterwards, Joseph C. High purchased the farm and paid for it.

In July 1842, the testator left this state, and went to New York, from which port he sailed on the 20th of that month, on board of the ship Plato, William S. Hoyt, Master, bound on a voyage to Rio Janeiro, and Montevideo

in South America.   During the voyage out, his health declined rapidly.   He did not leave the ship, except for occasional visits of a few hours on shore, at the ports last named.

On the 26th of October, while the Plato was lying at anchor in the harbor of Montevideo, he expressed to Captain Hoyt his consciousness that his end was approaching, and said he wished to make his will.   He requested the Captain to write it, as he should dictate,—he being too feeble to write himself.   This was about one o'clock, P. M., and in the cabin of the Plato.   Captain Hoyt proceeded to comply with the request, and wrote the following, as it was dictated to him by said Nathaniel.

Dear Brother Joseph C. High:

Dear Brother, it has become my painful duty to call upon Capt. W. S. Hoyt to inform my distant relations of my dying request; and it is owing to the kind and brotherly treatment I have received from Capt. Hoyt, that I am not now in my grave; and I request him to notify you of my last wishes.   I wish you, my brother Joseph, to make use of the money I left with you as your own. I give and grant it to you.   And my watch I leave to Mary Ann, your wife.   Dear Brother, I began the voyage in the hopes of obtaining my health, and after all the kind and friendly attention I could receive on the passage, I arrived safe at Rio de Janeiro.   There I went on shore, but finding the climate wet, and the prospect all against me, I concluded to remain with Capt. Hoyt, and go farther south.   And now, at this place, although all has been done for me possible, I am fast falling away; and I still remain with Capt. Hoyt, for I should soon die on shore, and have all the attention I can ask or wish.   I had a Doct. at Rio, and he told me he could do nothing for me; and I have had a Doctor here, and he ordered me to remain on board the ship, saying that I would get no atten-

tion on shore, and the expenses are very high.   Dear brother, Capt. Hoyt has done all for me that any man could do, and I am happy to know that you will feel satisfied that I found a friend in my last and trying moments.   Captain Hoyt has given me friendly and christian counsel, and I hope I have profited by it, and am prepared to meet my Saviour in the world above, where all is peace and rest. I know that I have been a great sinner, and I look to Christ for pardon and acceptance.   I have long been thoughtless, but now I feel there is no hope but in Christ. O, take warning from me, and turn to God, who will abundantly pardon.   O give my dying words to all that are dear, and tell them to turn to Christ.   And, my dear Brother, put not off the evil day until it be too late.   O comfort my dear and aged Father, and see that he does not want for any thing during life.   Tell him I thought of him until the last.   And now, dear Brother, I have given all things into the charge of Capt. Hoyt—my papers and all my effects—to do and act as he thinks best.   My note of $3410, due to me in Cuba, I have lent to Capt. Hoyt for two years from the date of the note, if he will collect it, for his great kindness to me during the time I have been with him, and in all my illness, and wish you to take his note for the same.   And now, dear Brother, I bid you farewell."

Witness to signing,         (Signed)   *Nathaniel High.*
*Wm. S. Hoyt.*

The drawing up of this instrument occupied about two hours, and when it was finished, Capt. Hoyt read it over to said Nathaniel, who signed it, declaring at the time that it was his last will.   Capt. Hoyt at the same time subscribed his name thereto as a witness.   Although said Nathaneil was on the verge of the grave, and very feeble, his mind was sound and healthy.   He expired at one o'clock of the next morning.

It further appeared that the testator left in the possession of his sister in this state, a large trunk containing his clothing, which remained in her possession until after his death.

*H. T. Backus* for the appellant.

*H. D. Terry & James F. Joy* contra.

WING J. delivered the opinion of the court.

The proof of the instrument claimed to be the will of Nathaniel High, and indeed the only testimony as to any of the facts in this case which transpired on board the ship Plato, is contained in the deposition of Capt. Hoyt, taken in New York, under a commission issued by the judge of Probate. In the course of the hearing in this court, objection was made to the reading of this deposition, on the ground that the court of probate had no power to issue a commission to take the testimony of a witness residing out of the state. On a hasty glance at the statute we overruled the objection, and permitted the deposition to be read, reserving the question of its admissibility, however, for further examination. The consideration we have since given to this point has confirmed us in the views expressed on the hearing.

R. S. 1838 p. 435 § 28, provides that the deposition of any witness without the state may be taken under a commission, issued to one or more competent persons, in any state or country, by *the court* in which the cause is pending," &c. Sec. 30 provides that "*the courts* may make rules as to the issuing of commissions," &c. Sec. 6 of the statute relative to probate courts, (R. S. 1838 p. 385) provides that "the several judges of probate shall, from time to time, make rules for regulating the practice, and conducting the business in their respective courts, in all cases not expressly provided for by law;" under which

section the court of probate of Macomb county, had adopted rules concerning the whole subject of taking depositions of witnesses residing without the state. Sec. 7 of the same statute authorizes the judge of probate for each county to " make and issue all warrants and processes, that may be necessary or proper to carry into effect the powers granted to him," &c. The section last quoted was borrowed from the statutes of Massachusetts. In adopting it, we must be considered as adopting also the construction which the courts of that state had previously given to it; and in *Amory* v. *Fellows*, 5 Mass. R. 222, the supreme court of that state held, that this provision authorized the judge of probate to issue a commission to take the deposition of a witness to a will residing out of the state. Even if the language of the 7th section was not sufficiently broad to confer upon the probate court the power to issue a commission, we are inclined to think it might be derived from the other provisions of the statute above quoted.[*]

It is contended on the part of the appellant, that the instrument admitted to probate by the court below, is not a will. We do not think this objection is well taken.

It is not necessary that any particular form of words should be used to make a will. Lord *Hardwicke* says in 3 Atk. R. 163, that " there is nothing which requires so little solemnity as the making of a will of personal estate, according to the ecclesiastical laws of England; for there is scarce any paper that they will not admit as such." Judge *Story* says, also, that to constitute such an instrument, all that is necessary is, that " it should clearly appear to be the intention of the party to have it operate after his death, and not before." 8 Law Reporter 118. See also 1 Paige 368; Will. on Ex. 58; 1 John. Ch. R. 153.

---

[*] See R. S. 1846, p. 374, § 11, conferring the power in express terms.

The instrument in question here was drawn up, at the request of a person lying at the point of death, as his will. It purports on its face to be his will—his last will. It contains a bequest of all his property, and a parting farewell to his distant relatives. He executed it as his will, in the presence of a witness, who attested its execution. He died in a few hours afterwards. What element of a will was wanting here? See authorities before cited.

Another ground taken by the appellant is, that the instrument in question is not executed with the requisite formalities to entitle it to probate in the courts of this state.

It may be laid down as a general rule, though subject to some exceptions, that the law of the owner's domicil determines the validity of every transfer, alienation, or disposition of personal property, made by the owner, whether it be *inter vivos*, or *post mortem.* Story's Confl. Laws. § 383. *Holcomb* v. *Phelps* 16 Conn. R. 132. And it is now well settled, both in England and in this country, that a will of personal property, regularly made according to the forms and solemnities required by the law of the testator's domicil, is sufficient to pass such property, in every other country in which it is situate. Ibid. §§ 465, 468. *Desesbats* v. *Berquiers*, 1 Binney 336; *Holmes* v. *Remsen*, 4 John Ch. R. 460, 469; *Harvey* v. *Richards*, 1 Mason 381, and cases cited, p. 408, note; *Dixon's Ex'rs.* v. *Ramsay's Ex'rs.*, 3 Cranch 319; *De Sobry* v. *De Laistre*, 2 Harr. and John. R. 193, 224; 4 Hagg. Ec. R. 346, 354; Encyclopedia Americana, Tit. *Domicil*; *Grattan* v. *Appleton*, 8 Law Reporter 116.

It becomes necessary, then, to ascertain what was the domicil of Nathaniel High, who executed the instrument in question, at the time of its execution, and of his death. The inquiry, it should be borne in mind, is as to his *national* domicil,—the domicil, by the law of which, the succession to his personal estate is to be governed.

It may be laid down as a settled maxim that every man must have such a national domicil somewhere. It is equally well settled that no person can have more than one such domicil, at one and the same time. *Somerville* v. *Somerville*, 5 Ves. 786. It follows from these maxims, that a man retains his domicil of origin until he changes it, by acquiring another ; and so each successive domicil continues, until changed by acquiring another. And it is equally obvious that the acquisition of a new domicil does, at the same instant, terminate the preceding one. *Thorndike* v. *City of Boston*, 1 Metc. 245.

Domicil has been defined to be the place where a person has his true, fixed, permanent home, and principal establishment, and to which, whenever he is absent, he has the intention of returning *(animus revertendi.)* Enc. Amer. art. *Domicil*; Story's Confl. Laws, § 41. It has been otherwise defined to be the habitation fixed in any place without any present intention of removing therefrom. Story's Confl. Laws, § 43 ; *Putnam* v. *Johnson*, 10 Mass. R. 488. It is always that place which has more of the qualities of a principal or permanent residence, and more pretensions to be considered as such, than any other place. Two things, it is said, must concur to constitute domicil. First, residence, which however is not indispensable to retain domicil after it has been once acquired ; and, secondly, intention of making it the home of the party. Story's Confl. Laws, § 44. The question of domicil is, then, a question of fact and intent, and if these elements are found, the reference of the domicil to one place or another depends upon the comparative weight of the circumstances. In the language of the chief Justice, in *Abington* v. *North Bridgewater*, 23 Pick. 178, " it depends, not upon proving particular facts, but whether all the facts and circumstances taken together, tending to show that a man has his home or domicil in one place, overbalance all the

like proofs tending to establish it in another." See also, *The Venus*, 3 Pet. Cond. R. 115 ; Story's Confl. Laws, p. 44, 45 ; Enc. Amer. *Domicil* ; 3 Hagg. Eccles. R. 172 ; *Lyman* v. *Fisk*, 17 Pick. R. 234 ; *Thorndike* v. *City of Boston*, 1 Metc. 242, 245.

It appears from the evidence in this case, that the testator was born in Vermont, about the year 1812, where he continued to reside with his parents, who were domiciled there, until he went South some time prior to 1832, and before he had attained the age of twenty one. Vermont, then, was the domicil of his birth or nativity ; Story's Confl. Law, § 46; and it continued to be his domicil until he acquired another, which he could not do until he arrived at full age, and became a person *sui juris*. 1 Binney 352. Encyc. Amer. 614. He acquired no other domicil until he went South. He remained at the South until 1842, when he came to this state. Where he was during all this time does not appear, but for several years previous to his return to this country, he appears to have been on the Island of Cuba ; and from all of the facts in the case it is fair to presume that he was in business there. He had accumulated some property, and had debts due him there. During his absence, he does not appear to have had any fixed residence elsewhere. After his return to this country he said that he had been roaming about the world, and could not tell when asked where he lived : that he had then just come to this country to visit his friends. He had remained unmarried. Whether, when he left the parental roof, it was with the intention of again returning to the United States, does not appear. Did he, during his absence, lose his domicil in Vermont, and acquire a new one in Cuba ? " If," says Judge *Story*, " a person has actually removed to another place, with the intention of remaining there for an indefinite time, and as a place of fixed present domicil, it becomes his place of

domicil, notwithstanding he may entertain a floating intention to return at some future period." Confl. Laws, § 46.   Again, "If a man is unmarried, that is generally deemed the place of his domicil, where he transacts his business, exercises his profession, and assumes and exercises municipal duties and privileges." Ibid. § 47.   In view of these principles, I think it may be fairly concluded, from the facts in this case, that during his absence at the South the testator abandoned his domicil in Vermont, and acquired a new one in Cuba.

Did the testator afterwards abandon this domicil and acquire a new one in this state? It seems probable that before leaving Cuba, he had sold his property and closed his business there. He seems to have left there without any fixed intention as to his future domicil, or, perhaps, with the intention of returning, and to have come to this state on a visit to his parents and other relatives who resided here. He stated to Capt. Canfield that this was the object of his coming here. He remained here several months, residing with his relatives. While here he seems to have formed and frequently expressed a determination to make this his home.   1 Metc. R. 244; 7 Id. 201; 17 Pick. 234.   He was enfeebled by disease, and was without family ties elsewhere. The love of kindred which would naturally operate most strongly upon a person in his situation, drew him here. His acts while here, as well as his declarations, evinced an intention to make this his home. He negotiated for the purchase of a farm, not, as he said, on speculation, but to settle upon; that he might have a place to call his own—his home. He loaned money on bond and mortgage, and by his own direction was described in the mortgage as residing here. It is needless to recapitulate here all the evidence on this point, as it will be found in the preceding statement of the case.  But we think that all the facts taken together,

show clearly, that he abandoned his domicil in Cuba, and acquired a new one in this state.   He certainly had abandoned his domicil in Cuba.   As we have seen, he must at the same time have acquired a new one some where else. What other place than Macomb county could have been his new domicil?   Did not Macomb county most clearly have more of the qualities of his fixed and permanent residence than any other place?   See *The Venus*, 3 Pet. Cond. R. 115 ;  Encl. Amer. *Domicil;*  3 Hagg. Eccles. R. 172 ;  *Catlin* v.  *Gladding*, 4 Mason's R. 308 ; *Ex parte Wrigby*, 8 Wend. 134 ; 3 Vesey, 202 ; 2 Pet. Cond. R. 600.

It remains to inquire whether this state continued to be the testator's domicil until his death.   As to this I think there can be no doubt.   The testator left this state in July 1842, and proceeding directly to New York, he took passage on board of the ship Plato, bound for Rio Janeiro and Montivedeo, South America.   He remained on board of the ship, with the exception of occasional visits of a few hours on shore, while she was in port, until his death, in the harbor of Montevideo.   The testimony shows that this voyage was undertaken by the advice of his physicians, for the sole purpose of regaining his health; that he considered his recovery doubtful; but that, if he lived, he intended to return to Macomb.   Judge *Story* says that, " in many cases, actual residence is not indispensable to retain a domicil, after it has been once acquired; but it is retained, *animo solo*, by the mere intention not to change it.   If, therefore, a person leave his home for temporary purposes, but with an intention to return to it, this change of place is not in law a change of domicil.   Thus, if a person go on a voyage to sea, or to a foreign country, for *health*, or pleasure, or business of a temporary nature, with an intention to return, such transitory residence does not constitute a new domicil, or amount to an abandon-

ment of the old one." Story's Confl. L. § 44. Our conclusion, then, is that at the time of the testators death his domicil was in this state.

We have before seen that the law of the testator's domicil governs as to the formalities required in the execution of a will. It remains, then, to inquire whether the instrument in question here was executed with the formalities required by the law of this state?

It is urged that its execution should have been attested by three subscribing witnesses.

By the common law, every man has the right to dispose by will, of his personal property; and this right existed from the earliest period. Will. on Ex'rs. 103; 2 Bl. Com. 492.

This right is confirmed by § 4, of Ch. 1, p. 270, of R. S. 1838,* which provides, "that any person, of full age and sound mind, may, by his last will and testament, in writing, bequeath and dispose of all his personal estate remaing at his decease, and all his right thereto and interest therein." The 5th section of the same chapter, as amended by the act of 1839, (S. L. 1839 p. 220, § 14.) contains the only statutory provision relative to the attestation of wills. It is as follows: "No will, except," &c., "shall be effectual to pass any estate, whether real or personal, nor to change, or in any way to effect the same, unless it be in writing, and signed by the testator, or by some person in his presence and by his express direction, and attested and subscribed in the presence of the testator, by three or more competent witnesses, *if made within this state.*"†

The section last quoted, is, in express terms, limited in its application to wills executed within this state. It cannot, without violence to its language, be applied to the in-

* Re-enacted by R. S. 1846, p. 276, § 4.
† Substantially re-enacted by R. S. 1846, p. 276, § 5.

strument in question, which was executed at Montevideo, in South America.

The statute, then, confirms the previously existing common law right of every person to dispose of his property by will. It prescribes the formalities with which wills must be executed, when made within the state; but as to wills executed abroad, by parties domiciled here, and which we have already seen are governed by the laws of this state it is silent. What, then, is the law of this state as to such wills? We answer the common law, which is in force here except so far as it is repugnant to, or inconsistent with, our constitution or statutes.† Now by the common law, it is not essential to the validity of a will that it should be attested by witnesses. Will. on Ex'rs. 50. The instrument in question was executed with all the formalities which that law requires. The conclusion seems inevitable, then, that it was a valid will, properly executed, and that it is entitled to probate.

We are aware that it follows as a consequence of the view we have taken of the law of this state, that the most extensive estates, whether real or personal, may be devised by will executed without the state, by a party domiciled here, without any attestation whatever, and that this seems inconsistent with the policy of the statute which requires all wills executed within the state to be attested by three witnesses. But the statute is clear and explicit in its language: it requires attestation only, provided the will is executed within the state; and it would be an unwarrantable act of judicial legislation to construe it so as to apply to wills executed abroad.

On the argument, the counsel for the appellee asked whether, even if the evidence had not clearly established the fact of the testator's domicil in this state, it being shown

† *Stont* v. *Keyes,* ante. p. 84.

that he did not reside either in Vermont or Cuba; that, in the language of Justice *Washington*, he had turned his back upon both of these places; and that he was at Montevideo only for a special purpose, for a few days, and by compulsion; this court could presume that he had a domicil somewhere abroad, and that by the law of that domicil such a will was not valid? We think not. 8 Conn. R. 254; 7 Pick. 94; 4 Mass. R. 593. Under such circumstances, it being shown that the will was made out of the state, that it was found in the possession of a brother here, that it does not contravene our statute, but is duly executed under our laws, does not that *prima facie* entitle it to probate? In the absence of any proof we think it will be presumed that the common law prevails where the will was made. *Jones* v. *Palmer*, 1 Dougl. Mich. R. 379; 4 Ph. Ev. by C. &. H. 1126; 1 Cowen, 108; 10 Wend. 75; 1 Harr. & John. 710.

It was contended on the trial, that captain Hoyt was not a competent witness to the will, because he was a legatee. The testator, before his death, delivered the note due to him in Cuba, to captain Hoyt, giving him the use of it, for two years, in case he would collect it, as a compensation for his care and kindness. The fact that he had done so, is stated in the will; but we do not think that this made captain Hoyt a legatee, or that he derived any interest under the will. Besides, by our statute, a legacy to a witness is void. R. S. 1838, p. 271, § 7.* Where such is the case, a witness is competent. 2 Bl. Com. 377; 4 Cow. & H. Ph. Ev. 1342.

We are of opinion that the will in question should be admitted to probate.

* See R. S. 1846, p. 277, § 7.