# WILLIAM HARWOOD *vs.* THOMAS J. MARSHALL.

*Mandamus* is the appropriate remedy for a party who claims title to an office, even where the office is *filled* by the person *against whom* the writ is asked *claiming title.*

The present circuit courts have the same powers and jurisdiction in cases of *mandamus* as the old General Court had, and these powers are similar to the jurisdiction exercised by the court of King's Bench in England.

*Mandamus* ought to be used on all occasions where the law has established no specific remedy, and where in justice and good government there ought to be one.

*Mandamus* will not lie if there be another legal remedy, but that remedy must be specific and adequate to the object in view, framed to effect directly the desired end.

The judgment under *quo warranto* information might amove the occupant, but would not install the claimant in the office.

Where the Governor has been authorised by law to administer the oaths of office to certain officers, he may *certify* the fact, and *his* certificate under the great seal of the State is evidence of such fact.

Such certificate need not set out the form of the oath in words; it must be presumed that the oaths prescribed by the constitution and laws were administered and subscribed when the Governor's certificate states that fact.

But the constitution requiring the oaths to be taken and *"subscribed,"* the certificate must show *in terms* that the oath was *subscribed,* and without this it is not sufficient evidence of the qualification of an officer.

The limitation of thirty days within which the oaths of office must be taken, fixed by the *fifth* section of the act of 1852, ch. 172, does not apply to the officers mentioned in the *third* section of that act.

The bond of the State Librarian must, under the act of 1847, ch. 53, be approved by the *separate* committees of the Senate and House of Delegates on the Library; such approval by a *joint* committee would be against the terms of this act.

Under this act the committees of a succeeding Legislature may approve the bond of a Librarian appointed by their predecessors.

An unqualified order directing a *mandamus* to issue for the delivery of an office is an order for a *peremptory mandamus,* and being *final* in its character is the subject of appeal.

Upon petition for a writ of *mandamus* the *writ* must issue in the *first instance* in the *alternative* form, and where an order on such petition directs a *peremptory* writ to issue, it will on appeal be reversed.

Where this court reverses an order of the court below in a *mandamus case,* and the judgment of reversal is not necessarily final, a *procedendo* will be ordered under the act of 1826, ch. 200, whether the plaintiff or *defendant* be the *appellant.*

APPEAL from the Circuit Court for Anne Arundel county.

This was an application made by the appellee, on the 11th of April 1856, for a rule to be laid upon the appellant to show cause why a *mandamus* should not issue commanding him to surrender to the petitioner the office of State Librarian. This is the third application made by the same party for the same office, the two former being reported in 5 *Md. Rep.*, 423, and 7 *Md. Rep.*, 466.

The facts as to the *election* of the parties to the office are sufficiently stated in the former cases. This court, in the last case, decided that the bond of the State Librarian should be approved by the committees of the Senate and House of Delegates on the Library. Marshall, in his present application, states, that upon the next meeting of the Legislature after this decision, he submitted his bond as State Librarian to the committees of the Senate and House of Delegates on the Library, who duly approved the same, and that he has deposited it in the Executive Chamber, and that he has also taken before the Governor the oaths prescribed by the constitution and laws as required by law, and claims the office under this qualification and the same appointment as in the previous cases.

With his application he filed a copy of his bond, upon which was the following approval: "Approved January 18th, 1856. Jno. H. Sothoron, *Chairman,* Francis T. Davis, Jas. T. McCullough, Senate Committee on the State Library.—R. Goldsborough, *Chairman,* Wm. D. Bowie, J. H. Jarrett, John Corby, B. G. Harris, Benj. Witmer, House Committee on State Library." And also the following certificate, dated the 20th of March 1856, signed by the Governor and Secretary of State, and attested by the great seal of the State: "I, T. Watkins Ligon, Governor of Maryland, hereby certify that Thomas J. Marshall appeared before me since his election by the Legislature as State Librarian, and took the oaths of office as prescribed by the constitution and laws for the State Librarian, as required by law, and that since the 18th of January 1856, the said Thomas J. Marshall deposited in the Executive Chamber his bond, of which the foregoing is a correct copy, with the endorsement of approval endorsed thereon by the senate committee on the State Library, and by the house committee on the State Library. In testimony whereof," &c.

The rule was accordingly laid and Harwood showed cause, averring his own election, qualification and continuance in the office until his successor should be elected and qualified, denying that Marshall had bonded or qualified for the office in the manner and form required by the constitution and laws of the State, and also averring that on the 28th of February 1856, the Legislature elected Llewellyn Boyle State Librarian, who, on the 15th of March of the same year, deposited in the Executive Chamber his bond as State Librarian, which is approved by the same committee or committees on the Library by which the bond of Marshall is alleged to have been approved, and a copy of this bond is filed with the answer.

The cause having been argued the court, (Brewer, J.,) passed the following order: "It is thereupon, this 28th day of May 1856, adjudged and ordered that a *mandamus* issue to the defendant, William Harwood, commanding him to deliver over to the said petitioner the office of State Librarian, and all the books, papers, and other matters and things connected therewith." From this order the defendant appealed.

The cause was argued before LE GRAND, C. J., ECCLE-STON and TUCK, J.

*Wm. Harwood* and *Thos. S. Alexander* for the appellant, argued :

1st. That as the case stands upon the record Marshall has not shown a legal *qualification* for the office. The decision of this court upon the first appeal is conclusive of his election to office for a term which has not yet expired. The first question then is, has he taken and subscribed the oaths agreeably to the constitution? The 4th sec. of the 1st article of the constitution says, that *before* he shall enter upon the duties of his office he shall "*take* and *subscribe* the following oath," &c. Now he has not averred in his petition that he has *subscribed* the *oath;* the averment is that he has *taken* the oaths before the Governor. The Governor's certificate is, that Marshall appeared before him since his election and *took* the oaths of office as prescribed by the constitution and laws. This certificate therefore does not state that Marshall *subscribed* the oaths, nor is it in proper form or by the proper officer. The constitution, (Art. 2, secs. 22, 23,) requires the *Secretary of State* to keep a record of the official act of the Governor, and by the act of 1852, ch. 172, the oath of the State Librarian is to be taken and subscribed before the Governor, and to be preserved in a book to be kept by the *Secretary of State.* The record then is in the possession of the Secretary of State, and not of the Governor. The latter officer cannot therefore certify, but the certificate is to be given by the Secretary of State. 1 *Greenlf. on Ev., secs.* 483, 485. Again, the certificate must set out and show in certainty *what oath* was taken and subscribed. 1 *Greenlf. on Ev., sec.* 498. But again, the oath was not taken in proper time. The constitution, (Art. 1, sec. 4,) prescribes no time within which the oath is to be taken, but provides, that if any person elected to office shall *refuse* or *neglect* to take such oath, he shall be considered as having *refused* to accept the office and a *new election* shall be had. The constitution therefore having prescribed no certain time within which the oath shall be taken, leaves it

necessarily to the appointing power to determine what is such neglect or refusal as ought to avoid office. The act of 1852, ch. 172, was intended to reduce this time to *certainty* and ought to be liberally construed, and the 5th section of this act fairly interpreted covers this case, and requires the oath to be taken within *thirty days* from the date of the election or appointment. Such was not the case here, for Marshall was elected in 1854, and it is not shown that he took the oath before 1856, and a *new election* of Librarian has been in the meantime made by the Legislature.

2nd. That he has not legally *bonded.* The office was created by the act of 1826, ch. 53, and the Librarian was to be appointed by the Governor, and to give bond to be approved by the Governor. By this act augmentations were to be made to the Library under the direction of a *joint* committee of *three* of the senate and *three* of the house to be appointed for the purpose. By the supplementary act of 1847, ch. 53, which is to be construed as part of the original act, the Librarian was to be appointed by a concurrent vote of the two houses of the Legislature, and his bond was to be approved by the committees of the "said senate and house on the Library," which means a joint committee of *three* of the senate and *three* of the house. Now the objections to Marshall's bond are:—1st, that no such committee approved it; 2nd, that the *number* of the committee who did approve was *illegal,* and 3rd, that he was elected in 1854, and gave bond in 1856, *after* the Legislature making the *appointment* had *ceased* to *exist.* Now Marshall has not alleged that the committees on the Library who approved his bond were appointed according to law, or that the bond was approved according to law, which is necessary. *Chitty's Pl.*, 214. *Stephen on Pl.*, 304. The committees on the Library mentioned in the act of 1847, ch. 53, must mean the committees composing the *joint* committee of *three* from each house mentioned in the original act of 1826, because none other are mentioned. 6 *H. & J.*, 383, *Mayor, &c., of Balto., vs. Howard.* 4 *G. & J.*, 4, 5, 6, *Canal Co. vs. The Rail Road Co.* This provision of the law as to the constitution, appointment and *number* of this

committee, is just as obligatory upon the Legislature, until superseded by some other *act* repealing it in express terms, or by necessary implication, as upon any citizen of the State. The Legislature can no more disregard an existing law, except by the passage of another *law* repealing it or *inconsistent* with it, than can any other person. Until therefore the Legislature, by another *law*, repealed the laws of 1826 and 1847, they were *bound* to appoint a *joint* committee on the Library of *three* from each house, whose duty it was to approve the bond of the Librarian, and their action in appointing *separate* committees of *three* from the senate and *five* from the house was illegal, and such committees so constituted and appointed had no legal authority to approve the bond. But again, a committee of any other Legislature cannot take cognizance of any business not initiated in the Legislature of which they are members and by which they are appointed a committee. The act of 1847 expressly directs, that the committees on the Library of the "*said;*" that is the *same* "Senate and House of Delegates," shall approve the bond. Now Marshall was elected by the Legislature of 1854, and his bond was not approved until 1856, and, consequently, not by the committees of the "said Senate and House of Delegates" by which he was elected.

3rd. That Marshall has not shown that *when* he took the oath of office he had executed the bond, and it cannot be presumed that he had done so. He should have shown that he has complied with every requirement of the law, and taking the oath *before* the execution of the bond was nugatory. The constitution, (Art. 1, sec. 4,) treats the taking of the oath as the *finality* in the process of qualification. It is the acceptance of the office, and he is then accepted as the officer.

4th. That the order of the court below appealed from in this case awards a *peremptory*, instead of an *alternative, man-damus*, and ought therefore to be reversed. 3 *Bl. Com.*, 111. 4 *Cowen*, 73, *The People vs. Judges of Westchester.* 1 *Caine's Rep.*, 7, 8, *People vs. Everitt.* 1 *H. & J.*, 480, *Brosius vs. Rueter.* 4 *H. & McH.*, 429, *Runkel vs. Winemiller.* 10 *Wend.*, 25, *Commercial Bank vs. Canal Commissioners.* 35

*Eng. C. L. Rep.*, 572, *The Queen vs. Baldwin.* 2 *Ev. Harris*, 704 to 708. *Lilly's Entries*, 248, 614. In *Tapping on Mandamus*, 401, it is said, a peremptory *mandamus* may in some cases issue in the first instance, as, *by consent*, as in 10 *Wend.*, 30, and in some other cases of extraordinary emergency, but not in a case like the present. But it is said this order is not for a *peremptory* writ, but that an alternative writ could issue under it. This presents purely a question of *construction*, and it seems to us that the terms of the order are too plain for controversy, and that under it the clerk would be *violating his duty* if he issued any other than a *peremptory* writ, for the *writ must follow the rule*.

5th. That the writ of *mandamus* is not the appropriate remedy in this case. There is no adjudged case in Maryland showing that it is the proper remedy. In 1 *H. & McH.*, 28, *Bordley vs. Lloyd*, a *mandamus* to *restore* was refused, and that upon a *removed* officer to *deliver up* was granted. The case of *Thomas vs. Owens*, 4 *Md. Rep.*, 189, was an application for a *mandamus* upon the State Treasurer to *pay money*. The general rule is, that the prosecutor must be clothed with a clear, legal and equitable title to something which is properly the subject of the writ, and that it will not be granted where there is any other legal and specific remedy, as, for instance, where there may be a *quo warranto*, which would be a sufficient remedy. 2 *Va. Cases*, 52, *The Commonwealth vs. Birchett.* 3 *Bl. Com.*, 263 to 265. 4 *Do.*, 311. 3 *Burr.*, 1269, *Rex vs. Barker, et al. Ibid.*, 1454, *Rex vs. Bankes, et al.* 33 *Eng. C. L. Rep.*, 89, *The King vs. The Mayor, &c., of Oxford.* And that the writ of *quo warranto* is known to Maryland law, see 9 *G. & J.*, 367, *The Regents, &c., vs. Williams.* But, at all events, the court will not in any case grant the writ to turn out and deprive of an office one who is in by a title *prima facie* good, or even doubtful, a *mandamus* not being the proper process to try title to office and to oust the occupant. 4 *Mod.*, 234, *Regina vs. St. Johns College.* 1 *Term Rep.*, 404, *King vs. Bishop of Chester.* 2 *Do.*, 259, *King vs. Mayor of Colchester.* 3 *Do.*, 652, *King vs. Marquis of Stafford.* 2 *Douglas*, 526, *King vs. Bank of*

*England.* 1 *Strange*, 538, *King vs. Dean & Chapter of Dublin.* 2 *Grattan*, 575, *Ex-parte Goolsby.* 2 *Leigh*, 165, *King William Justices vs. Munday.* 3 *Halsted*, 206, *State vs. Holliday.* 1 *Ala. Rep.*, 15, *Ex-parte Jones.* 1 *Iredell*, 129, *State vs. Jones.* 3 *Johns. Cases*, 79, *People vs. Corporation of Newport. Breese*, 68, *People vs. Secretary of State.* 3 *Hen. & Munf.*, 1, *Dew vs. Judges of Sweet Springs District Court.* In the last case the prosecutor had been in office *de facto*, and the *mandamus* went to restore him. 1 *Call.*, 562, *Smith vs. Dyer*, where also the party had been in office and the *mandamus* was to restore. 4 *Bac. Abr.*, 521. 13 *Pet.*, 607, *Opinion of Judge Catron*, in *Kendall vs. United States.* 1 *H. & J.*, 480, *Brosius vs. Reuter.* 4 *H. & McH.*, 429, *Runkel vs. Winemiller.* 9 *G. & J.*, 426, *Regents of the University of Maryland vs. Williams.*

6th. That in case of reversal of the order appealed from no *procedendo* can be awarded. If the order should be affirmed the case must go back, as a matter of course, for the party to receive the benefit of his writ, but if reversed the judgment of this court is *final. Ev. Pr.*, 440, 441, 445. The power of this court to award a *procedendo* in any case is derived entirely from statutes, and this being a *criminal case*, there is no statute and no decision authorising a *procedendo* where the judgment is reversed upon the appeal of the defendant.

*Alex. B. Hagner* for the appellee, argued :

1st. That the certificate of the Governor shows a full compliance on Marshall's part with the requirements of law in reference to the oaths of office. He charges in his petition, that "he has taken before the Governor the oaths prescribed by the constitution and laws *in manner as required by law*," and the certificate of the Governor is, that "he took the oaths of office as prescribed by the constitution and laws for the State Librarian, *as required by law.*" *Taking* the oath means *subscribing* it, and if not there is no *penalty* for not *subscribing*. It is the refusal or neglect "*to take*" the oath, under Art. 1, sec. 4 of the constitution, which is to be considered a refusal to accept the office. He took the oath *required by law* in *form*

*and manner prescribed by law.* If the law requires the form
of *subscribing* to constitute a proper *taking* of the oath,
then he who has *taken* the oath in the mode prescribed by
law must necessarily have *subscribed* it.   This certificate is
also given by the proper officer.  By the constitution, (Art. 2,
secs. 22, 23,) and the act of 1852, ch. 172, sec. 3, the Secre-
tary of State is but the *clerk* of the Governor, certifying and
recording what was done by the Governor in this matter.
The latter officer is therefore the proper one to give the cer-
tificate to be signed and attested, as is done by the Secretary
of State.   It is also to be remarked that Harwood files with
his answer Boyle's bond, and the certificate for that is by the
same officer and in the *same form.*   Nor is there any other
defect in form.   It is not *necessary* that the *oath taken* should
be *set out* in the certificate.   Nor is it necessary that Marshall
should have taken the oath within the *thirty days* required
by the 5th sec. of the act of 1852, ch. 172.   The 3rd section
of that act, relating to certain officers, was put in after the
other sections of the law, and the State Librarian inserted into
this section *afterwards,* (*House Journal,* 1039,) and this 3rd
section simply requires the officers therein named to take and
subscribe the oaths before the Governor, without specifying
within what time it shall be done, and it applies to an entirely
different class of officers from those embraced in the 1st and
5th sections of the act.   That the fifth section applies to such
officers only whose returns of elections or notifications of ap-
pointments are to be made or left in the offices of the *county
clerks* and of the *clerk of the superior court,* is manifest, not
only from the language of the section in question, but also by
the amendment to it in the act of 1854, ch. 18. sec. 9.   The
*election* of Boyle by the Legislature only shows that they
elected in anticipation of a vacancy, as they were authorised
to do by the decision in the former appeal in this case, in 5
*Md. Rep.*, 431, and is not legislative interpretation of the act
of 1852, ch. 172, that the neglect to take the oath within the
thirty days was a *refusal* on Marshall's part to accept the office.

2nd.  In regard to *the bond.*  It was not necessary to *aver*
that the *committees* who approved the bond were appointed

according to law, any more than it was necessary to aver that Judge Brewer, who was to try the case, or the Governor, before whom the bond was filed, was legally appointed. The petition *does* aver that the bond was *legally approved*, and this is all that can be required. The question then is, was the bond *legally approved?* It was decided in the former case, (7 *Md. Rep.*, 482,) that the bond must be approved by the committees on the Library, and that such committees cannot act during the recess of the Legislature. Marshall's bond was approved by the committees on the Library appointed by the Legislature, which met next subsequent to this decision and during his term of office. Unless this be determined a valid approval, an officer may be prevented from ever taking possession. Suppose the case of an election the *day before*, on the *very day* of the adjournment; the appointee is not present and cannot therefore give his bond before the adjournment, and the committees cannot approve it *afterwards*. In such a case he would *lose* his office, if the argument on the other side be valid, that the committees of the Legislature who elect can *alone* approve the bond. It is said a committee cannot take cognizance of any business not initiated in the Legislature of which they *are* members. This is not so, for they can look after the *financial arrangements* of their predecessors, adopt or reject the work of the codifiers of the laws and pleadings, revise reports of the *coupon committees*, and act on them, and so in reference to *lotteries, public works, reports from the Treasurer and Comptroller, banks, internal improvements, militia, inspection, &c.* The library is *entrusted* to the Legislature. It is to be protected by them. Are they to stand by and see the incumbent without a *bond* and the public interests suffering? Or is a worthy officer to be refused possession for such a reason? It is said the word " *said*" in the act of 1847, means the committees of the " *same*" Legislature which elected the Librarian. It may as forcibly be said that it means the *same* Legislature which existed in 1847 is *always* hereafter to *elect*, and *its* committees on the Library are always hereafter to approve the bond. Again, there is no validity in the objection as to the *number* and constitution of the committees who made this

approval. The act of 1847 *repeals* so much of the last section of the act of 1826, as requires a joint committee of three from each house, by requiring the approval to be made by the committees *as then existing*. Since that time the Legislature has enlarged its committees, which they have the right to do, inasmuch as they have the *exclusive* control of their own proceedings. *Old Const., art.* 24. 1 *Dorsey's Laws*, 26, 37. *Dec. of Rights, sec.* 8. *Legislative Guide*, 152. The two houses have full authority to regulate all matters connected with their proceedings, and may change the number of the members of the committees as they may see fit.

3rd. Marshall's petition alleges that he *filed the bond before* it speaks of his having taken the oaths of office. But it is altogether unimportant *which* act is performed *first*.

4th. That the order appealed from in this case is proper in *form* and in *substance*. In answer to the objections urged on the other side we say:—1st. That this is not an order for a *peremptory* writ, but for an *alternative* one, and is in the usual form; wherever the word *"mandamus"* is used in such a proceeding it *means* an *alternative mandamus*. The prayer in this petition, as in all similar cases, is simply for a writ of *mandamus*, meaning an *alternative* writ. *Tapping on Mandamus*, 6. 2 *Md. Rep.*, 341, *Watkins vs. Watkins*. In 1 *H. & J.*, 481, *Brosius vs. Reuter; 4 H. & McH.*, 434, *Runkel vs. Winemiller;* 10 *Eng. Law & Eq. Rep.*, 357, *Regina vs. Governors, &c.; Ev. Pr.*, 404; 3 *Burr.*, 1265, 1270, *Rex vs. Baker*, the alternative writ is simply called a *"mandamus,"* and not an *"alternative mandamus."* But, on the other hand, where a *peremptory writ* is meant, it is always *designated* as a *peremptory writ*. 4 *H. & McH.*, 439. 2 *Ev. Har.*, 448. The order of Judge Brewer is simply equivalent to the order of the English courts in such cases—*"Rule made absolute."* *Tapping*, 6. It is like the case of a *scire facias*, which has a clause to *summon the party* but is still *called* a *sci. fa.* Under this order the clerk should issue the writ in the *alternative*, and it would then be in the proper form. It is the same as the case where an *injunction* is ordered. The judge *simply* orders the writ, and does not give its precise *form*

to the *clerk*. It is said the writ must follow the rule, but suppose the order was simply "rule made absolute," what would be form of the *writ* in that case? But the fact is the *writ has not yet been issued*, and the appeal is therefore too soon, and even if this order were the writ itself it could be *amended*. *Ev. Pr.*, 405. *Tapping*, 6, 306, 334. 2nd. But if this was an order for a *peremptory writ*, still the courts in some cases, where the matter is *very plain* or the *exigency very great*, will order a peremptory writ in the *first instance*. *Tapping*, 401. 10 *Wend.*, 30, *Commercial Bank vs. Canal Commissioners.* Such is the present case. All the defences which could be taken have been raised in the answer to the petition, and discussed and decided by the court. There is therefore no necessity for an alternative writ for the purpose of raising *again* the same identical questions.

5th. That *mandamus* is the proper remedy and the proper mode of trying the title to an office in this State. A *prima facie* title only is necessary to be shown on application to *restore*, (3 *Term Rep.*, 577,) and *color of title* is enough in this case. 3 *Burr.*, 1265, *Rex vs. Barker*. *Tapping*, 186, 297, 303. It is used to *admit* to an office. *Tapping*, 8, 12, 1 *Cranch*, 169, *Marbury vs. Madison*. 3 *Bl. Com.*, 110. See also, as to where it is issued, *Tapping*, 5, 10, 173, 185, 193. *Ev. Pr.*, 406. It *pertains* to Harwood's office to give up the possession upon due qualification of his successor. 12 *Pet.*, 611. 1 *H. & McH.*, 28, *Bordley vs. Lloyd*. See also the following cases in favor of the writ in our case: 4 *Texas*, 400, *Banton vs. Wilson; Ibid.*, 391, *Fitzhugh vs. Custer;* 7 *Porter*, 47, *Etheridge vs. Hall; 3 Mass.*, 285, *Commonwealth vs. Athearn*, which decides that *quo warranto* is not the proper remedy, but that *mandamus* is. But it is said that *quo warranto* is the proper *procedure*. This is not so. Let us compare the law and decisions upon the two proceedings in this *State*. Our *acts of Assembly* recognise *mandamus*. The act of 1806, ch. 90, sec. 9, gives jurisdiction in such cases. The act of 1828, ch. 78, regulates the writ, whilst that of 1845, ch. 7, gives an appeal. But there is not a word in the statutes of the State about *quo warranto*, and no *form* of such

a writ is given in the *form books*. It is pronounced *obsolete* in *Ev. Pr.*, 408, 410, and also in *Kilty's Reports of Statutes*, 248. The reason for this, probably, is stated in 3 *Bl. Com.*, 264; 1 *Do.*, 485, and 4 *Mod.*, 236. This reason was the abuse of *quo warranto* by Kings *Charles* and *James*, in suppressing charters, and our ancestors here probably refused to use it from horror occasioned by such abuses of it in England. But the writ of *quo warranto* was never granted, except where there was a usurpation upon the *Crown*. 4 *Term. Rep.*, 381, *Rex vs. Shepherd.* 3 *Bl. Com.*, 262, *note* 7, and 5 *Wheat.*, 291, *Wallace vs. Anderson*, the only case in the United States Reports decides the same point. The present is not a case of usurpation upon the *executive* branch of government. If, therefore, the law of England applied here in every respect, the *quo warranto* could not issue in this case, because it is only a usurpation upon the *legislative* branch of the government. The statute of 9 *Anne, ch.* 20, was only adopted in Maryland so far as it applies to *mandamus*, and not as to *quo warranto*. The only place where the words "*quo warranto*" are to be found in the Maryland Reports, is in 9 *G. & J.*, 397, 426, and here it is only *incidentally* named as one of the proper proceedings "to enforce the forfeiture of a charter;" this was merely an *obiter dictum*, and had no connection with the case. There is just as much in the reports to show that "*Wager of Battel*" and the "*Peine fort et dure*" still exist in this State, as to show that *quo warranto* is in force here. But how is it with respect to *mandamus* in our decisions? There are no less than *thirteen* decisions in Maryland showing it is in force as a remedy: (1 *H. & McH.*, 28, *Bordley vs. Lloyd.* 4 *Do.*, 429, *Runkel vs. Winemiller.* 1 *H. & J.*, 359, *Ellicott vs. The Levy Court. Ibid.*, *Brosius vs. Reuter*, and the same case *Ibid.*, 551. 1 *H. & J.*, 558, *Howard vs. The Levy Court.* 2 *Gill*, 503, *State vs. Mayhew.* 4 *Do.*, 441, *Smith vs. Erb.* 2 *Md. Rep.*, 341, *Watkins vs. Watkins.* 4 *Do.*, 29, *Clayton vs. Carey, et al. Ibid.*, 189, *Thomas vs. Owens.* 5 *Do.*, 423, *Marshall vs. Harwood*, and the same case in 7 *Do.*, 482.) In 2 *Har. Ent.*, 705, is the form of the writ to admit a clerk. Is it not, therefore,

certain that the writ of *quo warranto* is *obsolete?* Where this is so the *mandamus* goes. ( *Tapping*, 5, 19, 20, 172.) *Quo warranto* is, at least, a *criminal* remedy, (3 *Bl. Com.*, 263; *Ev. Pr.*, 415,) and if this is admitted, as it must be, *mandamus* must go, for it goes wherever there is not a specific, legal, *civil*, remedy. (*Ev. Pr.*, 407.) Is not the existence of the remedy by *quo warranto* at least *doubtful?* If so, the writ of *mandamus* goes.· ( *Tapping*, 19, 24.) Is it not a *tedious* remedy? If so, *mandamus* goes. (*Ev. Pr.*, 403. 3 *Bl. Com.*, 265, *note* 11.) But if the *quo warranto* is still in force, this writ should go, for the courts grant it sometimes where a *quo warranto* is given. ( *Tapping*, 27. *Ev. Pr.*, 407.) The *quo warranto* cannot be considered a *certain* and *specific* remedy. How could we get such a writ issued? Suppose the State's attorney refuses to do it, how could we compel him? by *mandamus?* it is a *discretionary* power, and no *mandamus* lies for *that;* he may think there is no case and refuse to go to expense and trouble. Again, can a *private* person have *such a writ* at *common law?* (3 *Burr.*, 1819.) It issues only in the name of the government, when the prerogative of the *Crown* is interfered with. There was no *quo warranto* at *common law*, except as a *criminal process.* (3 *Bl. Com.*, 263. 4 *Do.*, 312.) The *civil* jurisdiction under the writ is given only by statute 9 *Anne, ch.* 20, which *never* was in force in Maryland. To show that it was formerly a *criminal* writ, no new trial was *allowed*, but now being a *civil* process, a new trial is granted, and this is by force of the statute of 9 *Anne.* On examination of the cases cited on the other side upon this point, it will be seen that in most, if not all of them, there was some other specific remedy applicable the several cases. The court could not have granted the *mandamus* in the cases of *Brosius vs. Reuter*, 1 *H. & J.*, 481, and 551, if the case of *Rex vs. Mayor of Colchester*, 2 *Term. Rep.*, 259, had been law in this State, for in those cases there was an *incumbent* in office. So also in *Runkel vs. Winemiller*, 4 *H. & McH.*, 429; 2 *Md. Rep.*, 341, *Watkins vs. Watkins*, and *Ibid.*, 29, *Clayton vs. Carey, et al.* See, also, 3 *Burr.*, 1269.

6th. As to the point that no *procedendo* can be issued by this court if they *reverse*, because the *defendant* appeals, and because it is a *State case*, I reply, 1st, that the act of 1845, ch. 7, gives the same right and imposes the same duties upon the court in appeals in *mandamus* as in other cases; and 2nd, that where a *defendant* appeals in a State case and the judgment is *reversed*, a *procedendo is ordered.* 6 *Md. Rep.*, 400, *Coch-rane vs. The State. Act of* 1826, *ch.* 200, *sec.* 10. 2 *Md. Rep.*, 245, *Kennerly vs. Wilson.* As to the point that *man-damus* issues only at suit of the *government*, I refer to *Runkel vs. Winemiller.*

Several of the points argued in this case *could have been* raised below, and should have been, and will not therefore be considered now. 33 *Eng. C. L. Rep.*, 90, *Rex vs. Notting-ham Water Works. Tapping*, 302, 349. 6 *Conn.*, 532, *Fuller vs. Plainfield School.* 5 *Term Rep.*, 74, *Rex vs. Mayor, &c., of York.*

Tuck, J., delivered the opinion of this court.

Four prominent questions arise on the present appeal:— *First*, whether the writ of *mandamus* is the appropriate rem- edy? *Second*, whether the appellee has shown a right to be admitted to the office of Librarian? *Third*, whether the order appealed from is for an alternative or peremptory *mandamus*? and *Fourth*, whether, in case of a reversal, a *procedendo* can be issued?

1st. As to the remedy. By the act of 1806, ch. 90, sec. 9, the county courts were clothed with the powers of the general court in cases of *mandamus*. As the circuit courts have the jurisdiction of the county courts, their powers, in these cases, are also to be measured by those of the general court, which we are told, in *Runkel vs. Winemiller*, 4 *H. & McH.*, 448, were similar to the jurisdiction exercised by the court of King's Bench; and by which, it was said, the general court might, and of right ought, for the sake of justice, to interpose in a summary way, to supply a remedy, where, for the want of a specific one, there would otherwise be a failure of justice."

The cases on this branch of the law are very numerous.

13    v.9

The force of the maxim, "*est boni judicis ampliare juris-dictionem*," seems to have been almost expended in the application of this remedy, to meet the emergency of new cases. *Tapping*, 3. *Com. Dig., Title, Mandamus*. Without citing many of the decisions, we content ourselves with referring to what Lord Mansfield said, in the case of *Rex vs. Barker*, 3 *Burr.*, 1266, as a precise and explicit statement of the principle governing the use of this writ according to the earlier authorities, and which has been generally, if not universally, recognized since his time: "Whenever there is a right to execute an office, perform a service, or exercise a franchise, (more especially if it be in a matter of public concern or attended with profit,) and a person is kept out of possession, or dispossessed of such right, and has no other specific remedy, this court ought to assist by *mandamus*, upon reasons of justice, as the writ expresses, and upon reasons of public policy, to preserve peace, order and good government."—"It ought to be used upon all occasions where the law has established no specific remedy, and where, in justice and good government, there ought to be one." This view of the office of the writ of *mandamus* was adopted in the case of *Runkel vs. Winemiller*, 4 *H. & McH.*, 448, and in *Marbury vs. Madison*, 1 *Cranch*, 168. See also 3 *Bl. Com.*, 110. *Tapping on Mandamus*, 172, 173.

It is said, however, that the writ is not demandable in the present instance, because the right to the office may be otherwise tried. It is clear that it will not lie if there be another legal remedy, but that remedy must be specific and adequate to the object in view, "framed to effect directly the desired end." 3 *Halst.*, 206. It must afford "complete satisfaction, equivalent to a specific relief." 2 *Doug.*, 525. We are told, in 1 *Ch. Gen'l Pr.*, 789, on the authority of *Andoley vs. Joye, Poph.*, 176, that the writ of *mandamus* may be compared to a bill in equity for a specific performance. *Evans' Pr.*, 404. In *Regents, &c., vs. Williams*, 9 *G. & J.*, 365, the rights of the actual parties to the controversy were determined in an action for money had and received, but if that course had been pursued by this appellee, the judgment would not have placed

him in possession of the office. His ultimate success might have depended on its voluntary surrender by the appellant. In *Marbury vs. Madison,* it was held, that the action of *detinue* was not a specific remedy, because the judgment would be for the thing itself, (the commission,) *or* its value, whereas the party was entitled to the office or to nothing, and the commission was necessary to the enjoyment of the office. And in *Kendall vs. United States,* the court said, as a reason for sustaining the *mandamus,* and in reply to the argument that the post-master might be sued, that private actions at law seldom afforded adequate relief in these cases.

*Quo warranto,* or an information of that nature, has been resorted to in some cases, as preliminary to the *mandamus,* but we do not think that remedy necessary in this case. It might prove very inadequate, by reason of the delay. We must bear in mind that the claimant seeks not only the removal of the incumbent, but the possession of the office. No form of proceeding that will give him less than he asks and has a right to claim, can be said to furnish specific, adequate relief. Under the *quo warranto* information the judgment might amove the occupant but would not install the claimant. He might still find it necessary to resort to other process against some other person or officer who might deem it his duty to keep him out, and thus his whole term might expire in vain efforts to obtain that to which the constitution and laws may have declared him to be entitled. In *Strong's case,* 20 *Pick.,* 497, involving this very point, the court held, that the remedy by action at law, or *quo warranto,* would be very imperfect and partial, and that the evil could be reached only by *mandamus.* And in *Dew's case,* 3 *Hen. & Munf.,* 23, Tucker, J., in answer to the very objection now urged by the appellant, after quoting 3 *Bl. Com.,* 110, to show that this writ may be issued in some cases where the law gives another more tedious mode of redress, *as in the case of admission or restitution to an office,* added: "This is the very case before us, and although possibly the injured party may have another remedy, I think there is no other so well adapted to the nature of the case as that of *mandamus.*" In the same case, Roane, J., said, it was im-

portant that a speedy decision should be given, and, as condu‑ cive to that end, the most direct remedy should be pursued, which is consistent with justice and the policy of the laws. And, as to the *quo warranto* proceeding, he added, that "it was not in itself a specific remedy; it only paved the way for the introduction of a specific remedy, by producing a judgment of *ouster* against the person in actual possession." We con‑ sider this a very reasonable and correct view of the law of *mandamus,* as applicable to the character and tenure of the office of Librarian, and that the writ will lie unless there be something in the only remaining point urged on this part of the case, to wit, that the writ is never granted where the office is filled by a person claiming title.

We have carefully examined the authorities cited, and find that this is not, by any means, recognized as a general propo‑ sition, either in England or in this country. There are deci‑ sions on either side. The principle has been applied, for the most part, in those cases where the writ was invoked against corporations, bishops, or others, with whom resided the power of appointment, or induction, or admission, and where some other person, not party to the writ, was in possession under color of title. In these cases it would be manifestly against the first principles of justice to direct the amotion of the incum‑ bent, when, by another form of proceeding—*quo warranto* information—*quare impedit, &c.*—he might have an opportu‑ nity of being heard in defence of his rights. This is certainly the ground on which the court proceeded in the cases of *The People vs. Mayor, &c., of N. Y.,* 3 *Johns. Cases,* 79, and *The People vs. Forquer, Breese,* 68. This reason is not given in all the cases, but it does appear that in some of them, Amer‑ ican as well as English, the person in office was held to be a necessary party to the *mandamus,* which shows that, according to these decisions, the writ may go where the person to be affected can be made a party, and the doctrine, that the writ will not be granted where the title is disputed, must, we think, be confined to those cases in which the contest is made by another person in and claiming the office, yet is not a party to the writ. The authority of *The People vs. Mayor, &c., of*

*N. Y.*, 3 *Johns. Cases,* was not recognized, but disregarded, in 20 *Pick.*, 496, where it is said, "notwithstanding the respectability and weight of this and the other authorities cited, there are certainly very many the other way." In *Dew's case,* also, (3 *H. & Munf.*, 1,) the question is discussed by Judge Roane, and, as we think, properly disposed of.

In the present case the process is asked against the only person who is interested in contesting the claimant's right. The incumbent's original title is not questioned in this proceeding, but it is contended that he has been superceded, under the constitution, by the election and qualification of Marshall, so that if Marshall is entitled the appellant remains in wrongfully. His right ceases the moment Marshall's becomes perfect, the completion of title in one *per se* terminating that of the other. We have decided, (5 *Md. Rep.*, 423,) that Harwood's term would expire on the 23rd April 1855, though his right would continue until the qualification of Marshall. If this has occurred, does it need a *quo warranto*, or an information of that nature, to ascertain by what authority the present incumbent is in office and claims to exercise its functions? If the fact be as averred by Marshall, the constitution declares that Harwood has no right to hold the office, and therefore "no utility can result from a trial on *quo warranto* information." 3 *Hen. & Munf.*, 37.

2nd. As to the appellee's title to the office. We will consider the several objections to the writ, made on the part of the appellant, under this question.

We are of opinion that the Governor, having been authorized to administer the oaths of office, may certify the fact. It may be observed that the certificates heretofore issued from the executive department, of the appointment and qualification of officers, merely assert the fact, without showing the *quo modo.* County clerks have always certified the appointment and qualification of justices of the peace and other officers, by merely declaring the fact, without reference to the evidence of qualification in their offices. Are we to presume that the law denies to the Governor, who is charged with the execution of the laws, and presumed to know what they enjoin, less capacity to declare

what he has himself done in the matter of qualifying officers under the constitution? But, if the Governor cannot certify, how is the fact to be ascertained? It is answered, on the part of the appellant, that the qualification is required, by the act of 1852, ch. 172, to be made matter of record, and that a certified copy must be produced, under the hand of the Secretary of State and the great seal. The only authority given to the Secretary, by this act of Assembly, to certify, relates to a class of officers named in the fourth section, which does not embrace the Librarian. It is not included in his duty to preserve a record of the oaths and signatures of the officers. Besides, the law has no where made such certified copies evidence any more than the mere certificate of the Governor. If one be rejected there would be no reason for receiving the other, and parties might be driven to the necessity of producing the original book in all cases where the legality of the qualification might be called in question. In any view of the point the Governor must sign his name. The Secretary has no control over the great seal. The act of 1853, ch. 131, places it in his custody, but under the control of the Governor, who alone can authorize its use, and is required to verify, by his signature, every document to which it may be affixed. See also the act of 1853, ch. 448. The act of 1852, ch. 172, in so far as it requires a book to be kept, is merely directory, to preserve proof of the qualification of public officers. If an officer qualifies according to the constitution and laws, and the book should not be preserved, we have no idea that such omission on the part of the Secretary would defeat his right to the office, or render his acts invalid, merely because a copy of his qualification could not be taken from the record. There is no need for the form of the oath being set out in words in the certificate, to enable the court to see that the proper oath has been taken. The forms are prescribed by the constitution, and when the Governor's certificate declares that the officer has qualified, or has taken and subscribed the oaths prescribed by the constitution and laws, it must be intended that the proper oaths were administered and subscribed. The instances of attachment and others, referred to in the argument, do not apply,

because in these cases the proceeding is special, and the acts of Assembly must be strictly pursued.

Next, as to the sufficiency of the certificate. The constitution expressly declares that the officer shall subscribe the oath. Taking and subscribing the oath constitute the qualification, as far as the case is governed by the fourth section of the first article. A majority of the court is of opinion that this certificate is not sufficient evidence of the appellee's qualification, because it does not show in terms that the oath was subscribed, and there is no expression from which an intendment to that effect can be made.

In reference to the limitation of thirty days, in the fifth section of the act of 1852, ch. 172, within which officers are required to qualify, we may remark that it does not apply to the officers mentioned in the third section. Within what time such officers are required to qualify we need not now inquire, as there is nothing before us to show that the appellee has forfeited his office by any such means, and we cannot presume that he has done so. On the contrary, it is more reasonable to suppose that a person who has sought and obtained an appointment, with emoluments, has done all the law makes necessary to complete his right to the office and its profits.

Nor do we think that the election of Mr. Boyle, from anything in this record, has superceded the claims of Marshall. The Legislature were not to presume that Marshall was not actually in office, or had lost it by any act or omission. As they had power to appoint his successor in advance of the expiration of his term, (5 *Md. Rep.*, 423,) we must suppose, until the contrary appears, that he was appointed according to the constitution for a term of two years, to commence at the end of Marshall's service.

We are next to inquire whether Marshall's bond has been properly approved. It is objected, on the part of the appellant, that the bond must be approved by a joint committee on the Library of that Legislature by which the party may be elected. We are of the opinion that a joint committee is not only unnecessary, but that such approval would be against the very terms of the act of 1847, ch. 53. The bond of the Librarian

originally was approved by the Executive. (Act of 1826, ch. 53, sec. 3.) By that law a joint committee was authorized to be appointed, for the purpose of making disbursements. That committee never had anything to do with the Librarian's bond. But, by the act of 1847, ch. 53, the mode of appointment was changed, and also the manner of approving the bond. The appointment was required to be by concurrent vote of the two houses of the Legislature, and, in case of vacancy during the recess, by the Governor—the bond in the latter case to be approved by the Governor, and in the former by "the committees of the said senate and house on the Library." If, as contended in argument, the two houses of the Legislature had no authority, except by a law, to appoint separate committees on the Library, thus repealing the act of 1826, the restriction would only be in pursuance of the *sixth* section of that act, which, as we have seen, required a joint committee for the purpose of disbursements, and *perhaps* separate committees would have no power to disburse the Library funds. It was certainly competent for the Legislature, by a law, as they have done, to indicate any other mode of approving the bond. It might, with as much reason, be said that the Governor could not approve the bond during the recess, because the sixth section of the act of 1826, ch. 53, authorized the appointment of a joint committee on the Library. So far as the approval is concerned, the act of 1847 repeals the *third* section of that of 1826, being repugnant thereto. For several years before 1847, and at that very session, each house appointed its own committee on the Library. In view of the existence of such committees the act of 1847 was passed, conferring on *them*, as separate committees, the power of approving the bond. And this we think was consistent with the mode of appointment. For, as that was by concurrent vote, it may have been the design of the framers of the law to give to each committee a separate and distinct vote on the sufficiency of the bond, in order that, as each house was a check upon the other in making the appointment, so the committee of each might have the same weight in approving the bond, and not be overruled by the greater number of the other.

Were the committees of the session of 1856 empowered to

approve the bond of Marshall, appointed by the Legislature of 1854, is the next inquiry? He was elected on the 7th March 1854, and the Legislature adjourned on the 10th of that month. We have no decision or act of Assembly to govern the question, except that of 1847, ch. 53. We must, in the absence of express language in the act directly controlling the point, consider the object of the laws in reference to the Library, and give to the act that interpretation which shall appear most conducive to the public interest, to subserve which alone any bond at all was required.

It is insisted that the word "said," before "senate and house," shows that the committees of the two houses of the legislative body making the appointment were intended. If the word be regarded at all, it may as well be said to refer to the previous words, "of this State," as indicating that, as the election was to be made by the "Senate and House of Delegates of this State," the bond should be approved by committees of the senate and house, of the same State. But, in truth, the word was uselessly employed, and in its present context has no meaning whatever. Like many other acts of Assembly the construction of this can be arrived at, according to the object and purpose of the law, without confining ourselves by the strict interpretation placed upon it by the appellant. As the bond was required, not for the benefit of the Librarian, or of any particular Legislature, but for the security of the State, we must so construe that act as best to subserve that purpose. Now, suppose that the Governor were called upon to make an appointment in the recess of the Legislature, and were to send a commission to the appointee, and then, before the party had qualified, the office of Governor were to become vacant, would not his successor have authority to administer the oaths and receive the bond? There cannot be a doubt of this. Then, in what does the case differ from the one before us, except that the Legislature is the appointing power, and its session expired, and with it the power of their committees to approve the bond, before the party holding the evidence of his election could prepare and offer his bond for acceptance? Again, suppose Marshall had filed a bond before the termination of the

14    v.9

session at which he was elected; that that bond had been approved by the committees; that he had gone into office, and, at the late session, it had been discovered that his bond was informal, or that his sureties had become insolvents, is it to be said that in such a case the State has no redress; that the incumbent might hold the office, without any security to the State, and that, though willing to renew his bond, he could not do so, because the committees of the Legislature which made the election are *functi officio?* Yet that is the result of the construction now placed on this act, on the part of the appellant, because, in the case supposed, Marshall having once qualified and been admitted, and done nothing to forfeit his office, he could not be amoved on account of the insolvency of his bondsmen. Looking to the intent and policy of the law in requiring a bond, and there being nothing in the act of 1847, ch. 53, requiring a different construction, it is the opinion of a majority of the court that the bond was properly approved.

3rd. As to the character and effect of the order from which the appeal is taken.

It is the opinion of a majority of the court, that, whatever may be the practice in cases of *mandamus,* as contended by the appellee's counsel, requiring the writ to issue in the first instance in the alternative form, according to which, as he insists, no other could have been obtained by his client under this order, the words of the order itself are too plain to admit of being controlled by such practice. It directs the *mandamus* to be issued for the delivery of the office to the appellee, without any qualification or condition whatever, and, being in terms final in its character, in pursuance of which a peremptory writ might have issued, was the proper subject of appeal.

4th. In consequence of the form of the Governor's certificate, and the absolute effect of the order, it must be reversed, and this view of these points in the case makes it necessary for us to decide whether the record can be remanded.

We understand the counsel for the appellant to contend that a *procedendo* cannot be issued, because this must be treated as a criminal proceeding, and the power cannot be exercised

in such instances. That it can be done in prosecutions for offences of the gravest character, where the State is the plaintiff in error, is shown by the case of *State vs. Buchanan*, 5 *H. & J.*, 368, in which the point was expressly made and decided; and several cases have occurred since. *State vs. Cassel*, 2 *H. & G.*, 407. *Dent*, 3 *G. & J.*, 8. *Dowell*, 3 *G. & J.*, 310. *Evans*, 7 *G. & J.*, 290. *Price*, 12 *G. & J.*, 260. *Sutton*, 4 *Gill*, 494. *Fearson*, 2 *Md.*, 310. *Phelps*, *Ante*, 21. It has rarely been allowed where the accused has sued out the writ of error, for the reason, as we suppose, that it would have been of no use to remand the record, inasmuch as no new trial could have been had. These cases have generally come up on demurrer to the indictment, or motion in arrest of judgment, founded on defects that could not be cured, and the judgment of reversal was necessarily final in the particular case. Such were the cases of *Bode vs. State*, 7 *Gill*, 326. *Capritz*, 1 *Md.*, 569. *Black*, 2 *Md.*, 376. *Raab*, 7 *Md.*, 483. But in *Root vs. State*, 10 *G. & J.*, 374, the power to order the writ was recognized, and it was not issued only because no new proceedings could have been instituted in the county in which the case had been tried. So in *Cochrane vs. State*, 6 *Md.*, 400, where the judgment here was not final, the writ was allowed. We do not find in the acts of Assembly any express warrant for a *procedendo* in criminal causes, but suppose it may have been granted in *Buchanan's* case, because it was proper to promote justice, under a liberal construction of the acts of Assembly in relation to that writ. Where the judgment here is not final, necessarily, this reason applies as well to cases where the accused is plaintiff in error, as where he is defendant. According to *Evans' Pr.*, 446, the writ will be issued whenever, on the reversal of a judgment, it is proper to attain the ends of justice, and the author gives instances of the practice not expressly provided for by the acts of Assembly. But we think that the words of the *tenth* section of the act of 1826, ch. 200, embrace cases of this kind. It is by no means certain that this is a criminal proceeding, even conceding, which we do not, that the act of Assembly last mentioned does not embrace State causes. True, it is a State writ, but

the controversy is practically a case *inter partes,* who alone are interested, except so far as the public may be concerned in having the office filled. "It is substantially a civil remedy for the subject, and the King's name is only nominally used. The object of the writ is, not to supersede legal remedies, but only to supply the defect of them." 3 *Steph. N. P.,* 2291. It was formerly a subject of much discussion whether a *quo warranto* information was not so far a criminal proceeding as to prevent a new trial, where the judgment was in favor of the defendant; but since it was held, in *King vs. Francis,* 2 *Term,* 484, that it was to be considered merely in the nature of a civil proceeding, it has been the practice to grant new trials, as well where the defendant as where the crown succeeded at the first trial. This being the law in cases of *quo warranto,* there is quite as much reason for treating writs of *mandamus* as merely civil remedies. In this view of the point the case is clearly within the tenth section of the act of 1826, ch. 200, as expounded in *Kennerly vs. Wilson,* 2 *Md.,* 245, and that of 1845, ch. 7, giving the right of appeal in cases of *mandamus.* This last act provides, that they shall be subject to the "same restrictions and limitations which exist in taking and trying appeals in other cases," and, as we think, subjects the parties to a *procedendo* in all cases where the court may think the purposes of justice require further proceedings on the application for the writ.

*Order reversed and procedendo awarded.*